# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHEASTERN DIVISION

MATTHEW W. CALVERT,        )
           )
    **Plaintiff,**        )
           )
vs.           )  **Case No: 2:17CV2 HEA**
           )
MIGUEL PANIAGUA, M.D., et al.,    )
           )
    **Defendants.**       )

## OPINION, MEMORANDUM AND ORDER

This is a civil rights action filed by Plaintiff, pursuant to 42 U.S.C. § 1983. The matter is before the Court on Plaintiff's Motion for Preliminary Injunction, [Doc. No. 40]. Defendants have filed a Response in opposition to the motion, Plaintiff has filed a Reply, Defendants have filed a Sur-Reply and Plaintiff has filed a Sur-Response. For the reasons set forth below, the Motion is granted in part and denied in part.

## Facts and Background[1]

Plaintiff is currently incarcerated in the Crossroads Correctional Facility in Camden, Missouri. Plaintiff claims he has been denied medical care in violation of the Eighth Amendment. Plaintiff's Amended Complaint alleges the following:

---

[1] The recitation of facts is taken from Plaintiff's Amended Complaint, and is set forth for the purposes of this Motion only. It in no way relieves the parties from the necessary proof thereof in later proceedings.

Prior to January 2011 and continuing to the present, Corizon, f/k/a/ Correctional Medical Services ("CMS") was retained under contract with the Missouri Department of Corrections ("MDOC") to provide medical services to inmates in the MDOC penitentiary system, including Plaintiff.

In 2005, the Plaintiff was diagnosed with Celiac Disease ("CD"), which is a gluten sensitive entizopathy. CD causes a permanent intolerance to ingested gluten.

In Hemochromatosis, a hereditary disorder, too much iron is absorbed, resulting in the accumulation of iron in the body. Hemochromatosis is potentially fatal but usually treatable. The gene associated with Hemochromatosis was identified and widely published in a myriad of medical journals, including the Journal of American Medicine ("JAMA") prior to 2011. The standard of community care for identifying Hemochromatosis is through specific blood tests that measure the levels of two substances: (a) Ferritin, a protein that stores iron, and: (b) the iron in transferrin, the protein that carries iron when it is not inside red blood cells. If these levels are high, genetic tests are to be immediately performed to confirm the diagnosis. A liver biopsy should also be performed to determine whether the liver has been damaged.

CD intersects with Hemochromatosis in two ways: a. Cases have shown the precipitation of iron overload and diagnosis of hereditary hemochromatosis after

successful treatment for CD.  b. An increased frequency in mutations in the Hemochromatosis susceptibility gene ("HFE") - suggesting a protective role against iron deficiency by enhancing iron absorption.

In August 2011, the Plaintiff was delivered to the custody of the MDOC, and upon his induction he immediately disclosed to the medical staff that he had been diagnosed with CD.  Thereafter, the Corizon medical personnel at the Fulton Reception and Diagnostic Center further diagnosed Plaintiff as anemic and deliberately prescribed Ferrous Sulfate (iron pills) for anemia, albeit ingesting iron pills for anemia of chronic disease is extremely harmful and likely fatal. These contraindications and the potential fatality rate were not disclosed to the Plaintiff when Ferrous Sulfate was proscribed by Corizon staff.

Thereafter, the Plaintiff was transferred to the Northeastern Correctional Center ("NECC") and the care of that site's Corizon medical staff, to include Dr. Archer.

On January 3, 2013, Plaintiff's labs results indicated that his iron and ferritin level were extremely low, and he was scheduled for a doctor appointment with the chronic care clinic physician, Dr. Archer.  When examined by Dr. Archer, he opined that he was "very concerned" about these results and that he was going to prescribe 200 mg iron infusions twice weekly until the Plaintiff's iron levels returned to normal.

Plaintiff advised Defendant Archer at that encounter that he had already been taking Ferrous Sulfate by mouth for approximately one year, whereupon Dr. Archer stated that because of the history of CD, Plaintiff was not able to absorb iron in pill form and would have to take the IV infusions of iron.

Dr. Archer refused to test the Plaintiff for hemochromatosis due to the costs of the tests, albeit there were clear indicators that Plaintiff had that disease. Dr. Archer further refused to have Plaintiff's serum ferritin or C-reactive protein ("CRP") tested to differentiate between iron deficiency anemia, where oral iron can be beneficial and anemia of chronic disease, where oral iron should not be given, due to the costs of the further testing.

Dr. Archer is not a Hematologist, nor did he possess any specialized training in hematology or diseases related to that field of medicine and refused to consult with a specialist of this nature due to the costs of the consult.

For more than a year, the Plaintiff endured increasingly painful 200 mg. iron infusions intravenously twice weekly. Approximately six months into the first year of these infusions, Plaintiff's iron levels returned to normal.

During the entire year of 2013 the Plaintiff's Ferritin level consistently rose into toxic and deadly ranges. Although the Ferritin levels were consistently rising into the permanently harmful ranges, Dr. Archer ordered the infusions continued.

Plaintiff inquired of Dr. Archer whether these infusions should be continued in light of the fact his Ferritin levels had reached the range of 2,000 ng/mL or toxicity, in that they were more than six times normal - to which he replied he was going to continue the infusions until Plaintiff's liver became too damaged to endure them.

At that same meeting, Dr. Archer admitted that Plaintiff's liver enzymes, AST and ALT's, were elevated into the high levels but he wasn't too worried about the levels. Dr. Archer secreted the fact that these levels, as well as the decreased hemoglobin and glucose levels, indicated onset of severe organ damage by iron overload and hemochromatosis which had become deadly.

During that period of time, Plaintiff suffered from symptoms that included extreme and relentless fatigue, weakness of his body, weight loss, severe abdominal pain, joint aches and joint pain, grey/bronzing of his skin, and chest pains, which he reported to Dr. Archer repeatedly. Dr. Archer dismissed those marked symptoms and deliberately continued the iron infusions.

Dr. Archer again refused to send Plaintiff to a hematologist, dismissing his request for a specialist consult, although among all iron overloading disorders, hereditary hemochromatosis and transfusion dependent iron overload in hereditary anemia's, are central when considering the epidemiological impact, extent of burden and risk for iron related morbidity and mortality.

Thereafter, Dr. Archer continued the iron infusions for the remainder of 2013.

By August of 2013, Plaintiff's iron levels were dangerously high, his ferritin level reaching 651 ng/mL, nearly double the normal level, and his iron saturation levels had reached 56 - well within the high range and certainly beyond the treatment parameters originally explained at the onset of the infusions. Plaintiff's liver enzymes likewise were severely elevated to 80, almost twice the normal level, a prime indicator that the liver was beginning to fail due to the iron saturation and overload.

On September 5, 2013, Dr. Archer requested that Plaintiff be referred to a hematologist or oncologist. This request was denied by Dr. Bredeman, the regional Medical Director for Corizon.

Despite the fact that Plaintiff had not seen a specialist and testing for genetic hemochromatosis had been refused, Dr. Archer deliberately continued these iron infusions.  Dr. Archer persisted with Plaintiff's iron infusions well into 2014, during which time his Ferritin levels, ALT's, AST's, and iron levels remained elevated to from 3 to 7 times their normal levels. By early 2014, his Transferrin Iron Binding Capacity ("TIBC") and Unsaturated Iron Binding Capacity ("UIBC") remained dangerously low. Indeed, in some instances they could not even be

calculated due to the dangerously low UIBC. At this point, Plaintiff's ferritin level had risen to over 2,000 ng/mL.

Plaintiff claims that the ultimate result was that the Plaintiff was deliberately subjected by Dr. Archer to deadly, toxic iron over-load, iron poisoning and iron saturation, and Dr. Archer's unconstitutional behavior persisted in the face of the well-established medical indicators instructing him to cease the painful, invasive infusions or risk the Plaintiff's death or permanent damage to his organs.

Subsequent to Defendant Archer leaving his employment with Corizon, Plaintiff began seeing Dr. Cabrera on a regular basis in 2014. Dr. Cabrera, whom had been reviewing the Plaintiff's blood work, noticed the extremely and dangerously high ferritin levels present in the Plaintiff's blood and Plaintiff's unusual orange yellow skin tinge. Dr. Cabrera asked Plaintiff if Dr. Archer was trying to kill him by giving him these iron overloading infusions when his ferritin levels were so high (over 2,000 ng/mL), which indicated Plaintiff's entire body was being poisoned by the iron infusions and couldn't eradicate the iron from his system in such dangerously high levels. Dr. Cabrera further opined the iron was building up in Mr. Calvert's vital organs as a result of Dr. Archer giving him iron overload and could be stored excessively in Plaintiff's liver as evidenced by the high AST and ALT levels, the spleen and bone marrow, or worse, the brain - which would be terminal. The iron infusions were halted.

Plaintiff demanded to be referred to a hematologist, a specialist in these types of diseases, cellular and molecular poisonings. Dr. Cabrera refused to refer Plaintiff to a hematologist, because Corizon wouldn't approve the specialist consult due to the costs involved.  At this meeting Plaintiff then requested that Dr. Cabrera order the genetic testing to confirm that he actually had hemochromatosis and not some other disease, such as ACER.  Again, Dr. Cabrera refused to refer Plaintiff for genetic testing because Corizon wouldn't approve this type of testing because the cost of the genetic testing would be more expensive than a specialist consult, and they would not approve these types of tests due to the costs involved. Dr. Cabrera instead apparently had a phone call with Dr. Waheed, a hematologist, and decided to wait and see if Calvert's numbers would go down on their own.

While Plaintiff continued to suffer from iron toxicity, he was seen by Defendant Dr. Proctor. Dr. Proctor assessed Plaintiff's condition as seizure disorder, celiac, and anemia, failing to address Plaintiff's iron toxicity.

When Plaintiff returned to Dr. Proctor to discuss his lab results, Dr. Proctor again did nothing for Plaintiff's iron toxicity, but merely ordered a recheck in one month.

When Plaintiff's numbers remained elevated months later, another physician, Dr. Rardin, asked that Plaintiff be referred to a hematologist/oncologist for chelation therapy. Defendants, Drs. Babich and Kosierowski, denied the

request for a consult or for chelation, and instead authorized phlebotomies.
Plaintiff did not receive his first phlebotomy until December 2014.

Throughout the first six months of serial phlebotomies, Plaintiff endured
severe pain, fatigue, excessive loss of blood, tiredness, weakness, weight loss,
severe abdominal pain, joint aches and pains, other arthritic type pain, retained
graying and/or bronzing of his skin, and suffered from severe, excruciating chest
pains, as though he was suffering from heart attacks.

After enduring six months of six hour long, serial phlebotomies twice per
month, with very little drop in the ferritin and iron levels, and his TIBC levels
remaining dangerously low, Plaintiff demanded again to see a hematologist and a
geneticist for genetic testing to determine the origin and extent of the intentional
iron overloading, as well as the cellular damage exacted by iron overloading. The
Plaintiff further requested that he be given treatment within the standard of
community care for iron overload, that being iron chelation.

Iron chelation has been the industry standard prior to 2011. Iron chelation
removes iron from the blood with a chelation agent such as: desferrioxamine
("Desferal") or deferasirox ("Exjade"), both of which bind with iron in the blood
and cells to excrete the iron through the patient's urine.

Dr. Cabrera admitted to Plaintiff that iron chelation is the industry standard
for iron overload albeit this treatment is far too expensive and Corizon would not,

under any circumstances, pay for such costly drugs.  Plaintiff literally begged Dr. Cabrera to place an order for the drug, which he finally agreed to.

Within a couple days Plaintiff was summoned back to medical and advised by Dr. Cabrera "the iron chelation was denied by Dr. Babich" at Corizon's corporate office, because "'Corizon is not going to pay for this drug because it's too expensive.'" He then asked Plaintiff how much more time he had to serve, implying to get that treatment upon release.

Plaintiff again requested a consult with a hematologist and geneticist for genetic testing to determine the extent of the damage done by the iron overload on a cellular level, which Dr. Cabrera refused, reiterating the consult and testing being cost prohibitive.

In excruciating pain and unable to tolerate further IV based phlebotomies due to the exhaustion of his veins as direct blood access points, in February 2015, Plaintiff was referred to a specialist for installation of blood let portal in his chest. In March 2015, Plaintiff was seen by Dr. Doerhoff of Jefferson City, Missouri, who installed a very specialized Hickman heart catheter in Plaintiff's heart which had barbed endings requiring installation and removal by a surgeon specializing in these devices. This catheter was to provide Corizon staff direct access to Plaintiff's blood through the heart to assist in performing phlebotomies to remove the excess iron from Mr. Calvert's blood.

In June 2015, Plaintiff contracted an unknown infection at the catheter site, which was oozing viscous, green copious infected material, obvious to any laymen due to the color and putrid odor.

After being seen on a daily basis by Corizon nurses to change bandages at the infection site for two weeks, with no improvement in the site or infection, Plaintiff finally coaxed Dr. Cabrera to look at the infection. Dr. Cabrera ordered the infection cultured, but would not otherwise treat the massive, visible infection. Nor would he proscribe medications to combat the infection.

Three days later at another dressing change with the Transitional Care Unit ("TCU") nursing staff, the Plaintiff expressed that he was not feeling well, was experiencing chest pains and was running a 101 degree fever, whereupon the nurses stated that "without the culture being back there is nothing we can do for you."

Several hours later, Plaintiff's fever had risen to 102.4 degrees; he began convulsing with chills and self-declared a medical emergency. When the nurse saw Plaintiff's deteriorating condition she contacted the on-call doctor, Defendant Thomas Pryor, who was at another institution.

Dr. Pryor, without examining the Plaintiff, his medical file or knowing the type of Hickman catheter installed in the Plaintiff's heart, ordered the TCU nurses to remove the catheter from Plaintiff's chest. When the nurse relayed Dr. Pryor's

order to remove the catheter from his chest, Plaintiff vehemently protested and stated that Dr. Doerhoff, the installing surgeon, instructed him that this device must only be removed by a heart surgeon or other specialist due the barbed ending used to attach the catheter to his heart.

Over Plaintiff's vehement protests a nurse only identified as "Jeri" stated "I have removed these types of catheters hundreds of times before."  Nurse Jeri then proceeded to cut the stitches holding the catheter in place and started pulling violently on the catheter, causing Plaintiff extreme pain in the heart and causing him to scream out in pain and protest and telling her to stop.

Due to the material fact this nurse had not actually removed catheters of this type, nor could she have possibly known what type of barbed end apparatus held the catheter in place, it only came out about 1/4 of the way and she could not remove it.  Nurse Jeri then called another nurse into the room only identified as "Jodi," who next pulled on the catheter with all of her might but she, too, could not remove the catheter, again causing Plaintiff excruciating pain and causing him to scream out for the nurse to stop.

One of the nurses then decided to call Dr. Pryor back because they now opined that Plaintiff should be sent to an outside hospital to have the catheter removed.  While the nurses made the phone call to the doctor, they left the Plaintiff unattended in a TCU patient room.

Plaintiff immediately began having extreme difficulty breathing and tried to yell out for help, at which time a correctional officer came to the room and screamed for help.

When Nurse Jeri finally returned to the room she said "Oh S***!" and then called for other nurses to respond to the Plaintiff's room with a bottle of oxygen Once the oxygen finally arrived, Nurse Jeri affixed the mask to the Plaintiff's face, while Plaintiff was obviously experiencing a heart attack.

Nurse Jeri then stated she couldn't get the oxygen on because she didn't have a wrench - at which time someone yelled "where is the wrench to turn it on!" Minutes later another nurse brought in a different oxygen bottle with another mask and turned on the oxygen, which was several minutes after the cardiac arrest began. Plaintiff was then advised that paramedics had been called.

More than thirty minutes later the paramedics were let into the institution, whereupon they applied heart monitoring equipment and stated that a helicopter should be called because Plaintiff needed to go to a hospital "now!"

Once in the helicopter, a flight nurse stated "you are having a heart attack" and he was going to give Plaintiff medication to try to slow the rate of his heart, in that it was beating 300 bpm.

Once Plaintiff arrived at the hospital and was rushed to the heart catheter lab he coded four times.  Once revived for the fourth time, Plaintiff was taken to the ICU at the hospital where he remained for the next four days.

Dr. Peterson, a surgeon in the heart catheter lab, while removing the Hickman catheter, stated to the Plaintiff that under no circumstances should a nurse have attempted to remove this catheter and their actions, coupled with the iron overload caused the Plaintiff to go into cardiac arrest and could have killed him. Dr. Peterson further advised the Plaintiff that the only person who should have attempted to remove the catheter from the heart was a heart surgeon, and preferably the one who installed the device due to the fact that he would have knowledge of the precise type of device installed, and there were hundreds of different types of barbs available for the devices and without that direct knowledge of the type, it tears the heart and causes heart failure.

While in the ICU Plaintiff was diagnosed with sepsis due to his infected chest catheter. He was administered heart medications and antibiotics, which were to be continued upon his return to Corizon's care, as well as medication for Gout, which he likewise developed while in the ICU unit of the hospital.

Once the Plaintiff was discharged from the hospital and returned to the institution's TCU medical unit, Dr. Proctor reviewed the hospital medication orders but did not adhere to them, limiting certain of the medications.

Once sent back to his housing unit, Dr. Cabrera discontinued the antibiotics, although the infection was still present and obvious to a layman, in that it was still oozing the same putrid green liquids from the surgery site.

Defendant Cabrera openly admitted that Corizon and Dr. Babich were denying the medication due to costs issues, in that the medications were too expensive.

As Plaintiff's physical, nervous system and mental condition continued to deteriorate, he was finally seen by Dr. Shahid Waheed in September 2015, whom was likewise provided with a copy of the Plaintiff's medical file and history of blood work. Plaintiff expressed complaints to Dr. Waheed that he was suffering severe pain, fatigue, excessive loss of blood, tiredness, weakness, weight loss, severe abdominal pain, joint aches and pains, other arthritic type pain, retained graying and/or bronzing of his skin, and suffered from severe, excruciating chest pains, as though he was suffering from heart attacks. Plaintiff further presented symptoms to Dr. Waheed that he had endured six hour long phlebotomies, twice per month, with dangerously elevated ferritin and iron levels, and his TIBC and UIBC levels were dangerously low. Whereupon, Plaintiff requested Dr. Waheed conduct diagnostic tests to determine the genesis of the iron overloading and cellular damage done by these infusions, and to confirm whether he had ACER or hemochromatosis in light of the fact that he was not tolerating the phlebotomies,

and had dangerously low TIBC and UIBC levels, versus the dangerously high ferritin and iron levels, which were continuing to poison his organs, cells and central nervous system. Dr. Waheed denied these tests offering that he had never heard of Corizon approving these tests due to the costs. The Plaintiff further requested of Dr. Waheed that he be given treatment within the standard of community care for iron overload, that being iron chelation medications, in that iron chelation is the standard to remove iron from the blood with a chelation agent if serial phlebotomies are not being tolerated by the patient. Dr. Waheed admitted to Plaintiff that this is the only treatment he believed would be effective but Corizon already advised him they would not approve this treatment due to the costs. Dr. Waheed then terminated the consultation and returned Plaintiff to the MDOC for further consult with Dr. Cabrera. Dr. Waheed ordered continued phlebotomies, but stated that if the phlebotomies could not be tolerated, Plaintiff should have oral chelation.

Although a few phlebotomies were attempted, they were not tolerated by Plaintiff, and he was left overloaded with iron. Neither Dr. Cabrera, nor any other Corizon physician followed even a single recommendation given by Dr. Waheed. After Plaintiff's Hickman catheter was removed, bi-weekly phlebotomies were discontinued for nearly two years because Plaintiff was not fitted with a new catheter through which phlebotomies could occur.

In the summer of 2016, Plaintiff, himself, had to ask for continuation of phlebotomies to lower his still toxic iron levels. Nearly a year after the regular phlebotomies ceased, on June 21, 2016, Dr. Pryor looked into whether phlebotomies should be restarted. He referred Plaintiff for testing of genetic hemochromatosis, and the tests came back positive for a heterozygous mutation of the C282Y Locus. Corizon physicians then diagnosed Plaintiff with genetic or hereditary hemochromatosis.

In September 2016, after a surgeon refused to place a catheter for resuming the phlebotomies, Dr. Paniagua requested that Plaintiff be considered for chelation therapy. Drs. Bredeman and Kosierowski did not approve the chelation, but delayed, stating they would consider it.

While still without phlebotomies or chelation to treat his iron overload, Plaintiff's physical and neurological condition continued to rapidly deteriorate, and he started experiencing the onset of uncontrollable muscle spasms and tremors of the body and arms, which were clear indicators of the onset of Parkinson's disease.

Parkinson's disease is a progressive degenerative disorder of the nervous system characterized by tremor when muscles are at rest, slowness of voluntary movements and increased muscle tone rigidity and the progression of the disease ultimately causes untimely death of the patient.

Protein aggravation, iron excesses, and oxidative stress have been demonstrated as important factors leading to the pathogenesis of neurodegenerative processes linked as the cause of Parkinson's disease.

As Plaintiff neared his untimely death, he began demanding to be seen by a neurologist to diagnose these reasons for the central nervous system degeneration. On October 4, 2016, Plaintiff was finally seen by Dr. Batchu, M.D., a neurologist commonly utilized by Corizon. During his examination, Mr. Calvert advised the neurologist that due to serial iron infusions by Dr. Archer, by August of 2013, his iron levels were dangerously high; his iron saturation levels had reached 56 - well within the high range. Plaintiff's liver enzymes likewise were severely elevated to 80, almost twice the normal level, a prime indicator that the liver was beginning to fail due to the iron saturation and overload.

Plaintiff further advised the neurologist that Dr. Archer deliberately continued these potentially deadly iron infusions, and by the end of 2013, refused repeatedly to have genetic testing for Hemochromatosis or ACER to determine the potential origin of the increasing iron saturation and ferritin ratios which continued to indicate Hemochromatosis.

Plaintiff further advised Dr. Batchu that Dr. Archer persisted with Plaintiff's iron infusions well into 2014, during which time his Ferritin levels, ALT's, AST's, and iron levels remained elevated to from 3 to 7 times their normal levels. While

conversely his Transferrin Iron Binding Capacity ("TIBC") and Unsaturated Iron Binding Capacity ("UIBC") remained dangerously low. In some instances they could not even be calculated due to the dangerously low UIBC.

Based on Plaintiff's history of the deliberate and unnecessary iron infusions and the above history of the blood work, as well as his examination, Dr. Batchu stated that the Parkinson's disease was caused by the excessive iron infusions.

Dr. Batchu then ordered a Sinimet MRI Brain and C-Spine scan and to have the Plaintiff returned for further treatment in 4 weeks. The brain scan was necessary because changes in the normal iron and antioxidant concentrations in brain material from patient with Parkinson's disease has been demonstrated due to the fact that excess iron from overload accumulates in the Basil Ganglia, Red Nuclei and Cerebellum dentate nuclei and would be shown by MRI.

Defendant Paniagua changed Dr. Batchu's brain scan MRI order to only a C-spine MRI order.

Due to the involuntary tremors, patients with Parkinson's cannot tolerate the MRI process and it is the industry standard that they be sedated prior to beginning the MRI because the violent tremors only cease while Parkinson's patients are sleeping or heavily sedated.  When Defendant Paniagua scheduled the MRI with St. Mary's hospital he deliberately failed to order the Plaintiff sedated so he could not tolerate or complete the MRI - and when Plaintiff was taken to the hospital the

MRI technician was aghast at the proposition the Plaintiff was supposed to complete the MRI while suffering from Parkinson's and its resulting violent tremors, without sedation.  The Plaintiff attempted to persevere and endure the MRI, even though the violent tremors prohibited any type of imaging. The MRI technician stopped the test and returned Plaintiff to Corizon's care to be rescheduled with sedation.

When Plaintiff was returned to the institution, Dr. Paniagua deliberately falsified his medical records and stated that the Plaintiff refused the MRI, when in fact he was unable to complete the MRI due to the Parkinson's tremors and lack of sedation.

When Dr. Paniagua finally ordered an MRI with sedation of Plaintiff's brain, pituitary gland, and liver, it revealed iron deposits in Plaintiff's liver.

Despite orders from Dr. Batchu, Corizon has ignored Plaintiff's needs for consultations with specialists (including a hematologist/oncologist and follow up with Dr. Batchu or another neurologist).

On January 24, 2017, Plaintiff again saw Dr. Batchu for the treatment of his Parkinsonism. After examining Plaintiff, Dr. Batchu ordered that Plaintiff be referred to a hematologist for further treatment of his elevated iron levels, that he be provided with an electric wheelchair to treat his Parkinsonism, and that he be referred back to Dr. Batchu for follow-up care.

As of the filing of this Complaint, Plaintiff has not been provided with any of the necessary care ordered by Dr. Batchu. Plaintiff attempted multiple times to schedule a follow-up appointment with Dr. Batchu, but each request has been denied by Corizon. After Plaintiff's informal request for specialty care failed to produce any results, Plaintiff filed a formal grievance requesting the follow-up care that had been ordered by Dr. Waheed and Dr. Batchu.

Corizon denied Plaintiff's grievance on August 21, 2017, finding his current medical care adequate and stating that "you will continue to receive appropriate care/treatment as determined necessary by your provider."

Throughout the treatment of his Parkinsonism, plaintiff has consistently requested that he be allowed to purchase and use an electric wheelchair to allow him to move about independently. These requests for necessary medical care have all been pretextually denied by Corizon and its representative, Dr. Bredeman. Plaintiff first requested an electric wheelchair on November 15, 2016. The medical need for such a wheelchair was confirmed by both Dr. Batchu and Dr. Paniagua, who independently prescribed an electric wheelchair in January of 2017. The notes of another of Plaintiff's physicians, Dr. Brennan, indicate that she too believed Plaintiff required an electric wheelchair.

Despite the agreement among his treating physicians, Corizon has refused to provide Plaintiff with an electric wheelchair. This refusal has had serious

detrimental effects on Plaintiff and has kept him from participating in normal inmate activities.

On January 23, 2017, Plaintiff filed an administrative grievance requesting that he be provided with a long-handled toothbrush and an electric wheelchair, both of which were necessary aids to allow him to live a more normal life.

Defendant Corizon did not respond to Plaintiff's grievance until July 21, 2017, when it denied his request for an electric wheelchair, claiming that Plaintiff had not filled out a Request for Reasonable Accommodations. In fact, Plaintiff had filed a Request for Reasonable Accommodations, and the electric wheelchair had been approved by Dr. Paniagua on March 3, 2017.

Plaintiff submitted a Grievance Appeal on August 22, 2017, apprising Corizon officials of his previous approval and again requesting an electric wheelchair. Corizon again refused to provide Plaintiff with an electric wheelchair. This time, Dr. Bredeman, who signed the Grievance Response, found that Plaintiff's needs were adequately served by a manual wheelchair which he was incapable of operating himself. This decision directly contradicted the orders of Plaintiff's treating physician, Dr. Batchu, who had specifically prescribed an electric wheelchair as a medical necessity.

Plaintiff filed his Motion for Preliminary Injunction seeking an Order requiring Defendants Corizon, Bredeman, Babich, and Kosicrowshi to approve his

requests for follow up care with his treating neurologist, a referral to a hematologist, and an electric wheelchair be provided at his own cost.

Defendants filed a Response to Plaintiff's motion arguing he is not entitled to a preliminary injunction.

## Standard of Review

Rule 65 of the Federal Rules of Civil Procedures governs the issuance of temporary restraining orders and preliminary injunctions. In deciding a motion for a temporary restraining order or a preliminary injunction, the courts are instructed to consider the following factors: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Minnesota Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1307 (8th Cir. 1997); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993). While no single factor in itself is dispositive, the Eighth Circuit Court of Appeals has held "the two most critical factors for a district court to consider in determining whether to grant a preliminary injunction are (1) the probability that plaintiff will succeed on the merits, and (2) whether the plaintiff

will suffer irreparable harm if an injunction is not granted." *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976).

The burden of proving a preliminary injunction is warranted rests on the movant. *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). Further, the Eighth Circuit has instructed that "in the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Id.* (internal quotations omitted).

## Discussion

## Specialty Medical Care

**Likelihood of Success on the Merits**

To state an actionable § 1983 civil rights claim, a plaintiff must allege a set of historical facts which, if proven true, would show that the named defendant violated the plaintiff's federally-protected rights while acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). A plaintiff must plead facts showing each named defendant's personal involvement in the alleged constitutional wrongdoing. *Ellis v. Norris,* 179 F.3d 1078, 1079 (8th Cir. 1999); *see also Beck v. LaFleur,* 257 F.3d 764, 766 (8th Cir. 2001) (upholding summary dismissal of civil rights claims, because plaintiff's complaint "failed to allege sufficient personal involvement by any of defendants to support such a claim").

The Eighth Amendment requires prison officials to provide humane conditions of confinement. *Farmer v. Brennan,* 511 U.S. 825 (1994). One condition of confinement is the medical attention a prisoner receives. *Weaver v. Clarke,* 45 F.3d 1253, 1255 (8th Cir. 1995). In this context, prison officials violate the Eighth Amendment if they commit "acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing *Estelle,* 429 U.S. at 106). Allegations amounting to negligence, medical malpractice, or a disagreement with treatment decisions do not rise to the level of a constitutional violation. *Estelle,* 429 U.S. at 106; *Popoalii,* 512 F.3d at 499. Mere disagreement with medical treatment fails to state a claim of deliberate indifference. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (an inmate has no constitutional right to a particular course of treatment, and his mere disagreement with the medical treatment he receives is not a basis for section 1983 liability); *Pietrafeso v. Lawrence County, S.D.*, 452 F.3d 978, 983 (8th Cir. 2006) (showing deliberate indifference is greater than even gross negligence and requires more than mere disagreement with treatment decisions).

Deliberate indifference may be found when prison officials intentionally deny or delay access to medical care. *Estelle,* 429 U.S. at 104–05. When a delay in treatment is the alleged constitutional violation, however, the objective severity of

the deprivation should also be measured by reference to the effect of the delay in treatment. *Jackson v. Riebold,* 815 F.3d 1114, 1120 (8th Cir. 2016) (quoting *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005)).

In this case, Plaintiff is not merely disagreeing with the medical treatment he has been receiving; rather, he seeks medical treatment that has been determined by his physicians to be appropriate considering all the attendant circumstances. Dr. Batchu prescribed follow up neurological care as necessary. Likewise, Plaintiff has not been seen by a hematologist in two and a half years for the treatment of his iron toxicity, which condition has caused his Parkinsonism. Although Plaintiff has presented medical records indicating the need for these referrals, Defendants have refused them. Plaintiff is not seeking to substitute his opinion for that of the treating physicians; rather, Plaintiff seeks the medical treatment that the physicians have determined to be necessary. While Defendants argue that they are providing appropriate medical care for Plaintiff's conditions, Plaintiff's medical records indicate otherwise in that the treatment Plaintiff is currently receiving (and in some instances the lack of treatment) is ineffective, and Plaintiff's condition appears to be worsening, rather than resolving. Plaintiff has demonstrated a fair chance of success on his deliberate indifference claim. *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds* 530 F.3d 724, 732 (8th Cir. 2008). Defendants' decision to provide "*some* treatment" is

inadequate and, therefore, not constitutional. *De'lonta v. Johnson (De'lonta II)*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original). *See also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (internal quotation marks omitted) ("[A] total deprivation of care is not a necessary condition for finding a constitutional violation: Grossly incompetent or inadequate care can also constitute deliberate indifference....").

**Irreparable Harm**

"The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (en banc). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *Id.* Irreparable harm must be certain and imminent such that there is a clear and present need for equitable relief. *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/ Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995). When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys.*, 871 F.2d at 738.

The Court finds that Plaintiff has met his burden to show the threat of irreparable injury. Plaintiff asserts that he has and will continue to suffer irreparable harm in the absence of a preliminary injunction because of his Parkinsonism, which he claims occurred because of the iron toxicity he developed as a result of Defendants' treatment. The medical records establish that Plaintiff suffers and will continue to suffer from pain as a result of the phlebotomies.

Furthermore, the deprivation of Plaintiff's constitutional rights under the Eighth Amendment is alone sufficient to establish irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (internal quotation marks omitted) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

**Balance of Harms**

In considering the equities of a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* The balance of harms substantially weighs in favor of granting injunctive relief to Plaintiff. Plaintiff has met his burden to establish that he continues to face a possible deterioration of his health without the appropriate medical care. Performing ineffective care can clearly rise to the level of deliberate indifference to Plaintiff's medical needs.

Conversely, the hardship to Defendants is minimal; it is clearly merely a matter of payment for the services rendered by the specialists.

**The Public Interest**

Finally, the public interest weighs strongly in favor of issuing the preliminary injunction. Plaintiff seeks to protect his constitutional rights. This court must emphasize that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

**Electric Wheelchair**

**Irreparable Harm and Likelihood of Success on the Merits**

A preliminary injunction is meant to "preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994). Here, Plaintiff has simply expressed disagreement with the wheelchair he is being provided but offers no facts to support a conclusion that Plaintiff is in immediate danger of irreparable harm. While Plaintiff's life might be easier with an electric wheelchair, the record is completely devoid of any showing of irreparable harm without it. Thus, Plaintiff has failed to demonstrate he will suffer irreparable harm in the absence of injunctive relief. *See Williams v. Correctional Medical Services*, 166 Fed. Appx. 882, (8th Cir. 2006) (Plaintiff's claims concerning Hepatitis C testing and treatment showed neither threat of irreparable harm or likelihood of success on the merits to warrant a preliminary injunction); *see also Quint v. Lantz*, 248 Fed Appx. 218, 219 (2d Cir. 2017) (alleged denial of medical care, including preferred pain medication, for degenerative, rather than acute, medical condition did not suffice to show irreparable harm).

**Balancing Harm**

In balancing the harm and the injury to the Defendants if the injunction is granted, the balance favors the Defendants. Granting the injunction would amount to this Court interfering with the exercise of the medical judgment of the Defendants and the operation and administration of a state prison. As noted above,

the Court should grant injunctive relief only "with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Goff*, 60 F.3d at 520.

**Public Interest**

Finally, in assessing whether the issuance of an injunction would be in the public interest, it must be remembered that the "federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 229 (1976). Granting injunctive relief at this point based on Plaintiff's allegations would amount to direct interference by the Court with the operation and administration of the institution which is harmful to Defendants and does not serve any public interest.

**Conclusion**

Plaintiff has established the necessary elements that Defendants are failing to provide appropriate medical treatment to treat his condition. However, Plaintiff fails to satisfy the factors needed to order an electric wheelchair.

Accordingly,

**IT IS HEREBY ORDERED** Plaintiff's Motion for a Preliminary Injunction, [Doc. No. 40], is **GRANTED** in part and denied in part.

**IT IS FURTHER ORDERED** that Defendants shall, within 5 days from the date of this order, arrange for Plaintiff to receive follow-up care by a specialist in hematology and follow-up care by a specialist in neurology.

Dated this 8th day of May, 2018.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE